**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE BREMERTON CELLULAR TELEPHONE COMPANY LITIGATION | ) CONSOLIDATED<br>) C.A. No. 5949-VCL |
| IN RE SALEM CELLULAR TELEPHONE COMPANY LITIGATION | ) CONSOLIDATED<br>) C.A. No. 6886-VCL |
| IN RE PROVO CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 6887-VCL<br>) |
| IN RE BLOOMINGTON CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 6888-VCL<br>) |
| IN RE SARASOTA CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 6889-VCL<br>) |
| IN RE BRADENTON CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 7030-VCL<br>) |
| IN RE LAS CRUCES CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 7031-VCL<br>) |
| IN RE ALTON CELLTELCO LITIGATION | ) C.A. No. 7032-VCL<br>) |
| IN RE GALVESTON CELLULAR PARTNERSHIP LITIGATION | ) C.A. No. 7033-VCL<br>) |
| IN RE BELLINGHAM CELLULAR PARTNERSHIP LITIGATION | ) C.A. No. 7036-VCL<br>) |
| IN RE RENO CELLULAR TELEPHONE COMPANY LITIGATION | ) C.A. No. 7042-VCL<br>) |

**OPINION ADDRESSING MOTION TO ENFORCE CHARGING LIEN**

Date Submitted: October 10, 2024
Date Decided: December 9, 2024

Christopher P. Simon, David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; Joel Fleming, Amanda Crawford, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts; *Attorneys for Plaintiff*.

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Norman M. Monhait, REID COLLINS & TSAI LLP, Wilmington, Delaware; Michael A. Pullara, Houston, Texas; Allan B. Diamond, Justin Strother, DIAMOND MCCARTHY LLP, Houston, Texas; *Attorneys for Defendants*.

**LASTER, V.C.**

Partners holding minority interests in an array of partnerships hired solo practitioner Michael A. Pullara to pursue claims for breach of fiduciary duty against the partner holding the majority interest. The client agreements authorized Pullara to hire "joint venture counsel" and noted that Pullara intended to retain Ajamie LLP. Pullara and any joint venture counsel agreed to accept a 50% discount to their hourly rates in exchange for the opportunity to receive a contingency fee if they prevailed. Pullara subsequently brought on Ajamie as joint venture counsel, and Pullara and Ajamie entered into a fee-sharing agreement.

After lengthy litigation, the minority partners reached a favorable settlement with the majority partner. By that point, however, Pullara and Ajamie were squabbling over the fee. Pullara had the primary relationship with the clients, and many of them joined Pullara in disputing Ajamie's right to a share of the fee.

Ajamie responded by filing this action to secure a charging lien and recover its fee. The court granted a charging lien to preserve Ajamie's claim against the settlement proceeds. Ajamie now seeks to enforce the lien.

This decision holds that the fee-sharing agreement is unenforceable under the Texas Disciplinary Rules of Professional Conduct (the "Texas Rules"), but that does not deprive Ajamie of its right to a fee. Instead, it means that Ajamie is entitled to reasonable compensation under principles of *quantum meruit*. Ajamie is awarded a fee of $13,014,721.87 plus pre- and post-judgment interest as specified in this opinion.

## I.     FACTUAL BACKGROUND

For complex historical reasons, an array of general partnerships came to own licenses to provide cellular service in specific geographic areas. A national carrier

typically held a supermajority interest in the partnership. Minority investors held the balance. Over time, the national carriers sought to simplify that ownership structure by eliminating the minority partners. AT&T, Inc. followed that strategy and eliminated the minority partners from many of its partnerships using squeeze-out transactions.

Pullara is a Texas-based solo practitioner who litigated successfully against AT&T after a first round of squeeze-outs. When AT&T engaged in a second round of squeeze-outs, many of the minority partners (the "Clients") signed agreements retaining Pullara as counsel (the "Client Agreements"). The Client Agreements contained choice-of-law provisions selecting Texas law and noted that the State Bar of Texas regulated the conduct of Texas attorneys.[1]

Because Pullara is a solo practitioner, he needed help to litigate against AT&T. To that end, each Client Agreement specified that Pullara could "at his sole

---

[1] Client Agr. § 42. Citations in that form refer to Exhibit 8 to the Pullara Affidavit in Support of the Answering Brief in opposition to Ajamie's Motion to Enforce Charging Lien (the "Motion"), found at Transaction ID 74198088 ("Pullara Aff."). Citations in the form "Sharing Agr." refer to Exhibit B to the Simon Affidavit in Support of Motion to Enforce Charging Lien, found at Trans. ID 73648437 (the "Simon Aff."). Citations in the form "Settlement Agr." refer to Exhibit D to the Simon Affidavit. Citations in the form "Ajamie Dec. I" refer to the Ajamie Declaration in Support of the Motion, found at Transaction ID 73649219. Citations in the form "Ajamie Dec. II" refer to the Ajamie Declaration in Support of the Reply Brief, found at Transaction ID 74348208. Citations in the form "OB" refer to the opening brief in support of the Motion, found at Transaction ID 73647514. Citations in the form "AB" refer to the answering brief in opposition to the Motion, found at Transaction ID 74198088. Citations in the form "RB" refer to the reply brief in support of the Motion, found at Transaction ID 74348208. Due to the large number of docket entries, this decision uses Transaction ID numbers to make it easier for the reader to find the documents.

discretion, associate any other licensed attorney in the representation" to serve as joint venture counsel.[2]

Under the Client Agreements, Pullara and joint venture counsel agreed to charge fees calculated at 50% of their published hourly rates, as adjusted from time to time.[3] As additional compensation, Pullara and his joint venture counsel would receive a contingency fee equal to 20% of any recovery (the "Contingency Fee").[4] Some of the Clients subsequently signed amendments to their Client Agreements that eliminated their obligation to pay any further hourly fees in return for raising the Contingency Fee percentage to 30%.[5]

The Client Agreements made clear that adding joint venture counsel would not affect the size of the Contingency Fee. Instead, "the fees, if any, due to Joint Venture Counsel will be a portion of those fees earned by [Pullara]."[6]

The Client Agreements explicitly stated that it was Pullara's "current intention" to work with Ajamie.[7] As that language foreshadowed, Pullara selected Ajamie as joint venture counsel.[8] Pullara and Ajamie then entered into a separate

---

[2] Client Agr. § 41.

[3] *Id*. § 3.

[4] *Id*. § 3.

[5] Amendment to Client Agreement, Simon Aff. Ex. L part 1, No. 12.

[6] Client Agr. § 41.

[7] *Id*. § 41.

[8] OB at 5; AB at 3.

agreement to govern how they would share any fee among themselves (the "Sharing Agreement"). That agreement was drafted in Texas, signed in Texas, and called for any disputes to be arbitrated in Texas.[9]

The Sharing Agreement provided for Pullara to receive a fixed 30% of the Contingency Fee and Ajamie to receive a fixed 20%. It stated that Ajamie and Pullara would divide the remaining 50% based on their relative contributions to the case. That allocation would turn on their "time value of work," calculated by multiplying the total hours worked times their published hourly rates.[10]

Recognizing that Ajamie was part of the team, the Clients sent retainers to an Ajamie trust account. Over the ensuing years, the Clients periodically received invoices from Ajamie for fees and expenses. Although the Client Agreements authorized Ajamie to increase its rates, Ajamie never applied its annual rate increases to the minority partners. In other words, Ajamie only billed at 50% of its 2011 rates.[11]

The litigation took a long time. In 2022, the court issued its post-trial decision in a bellwether case. In 2023, the Delaware Supreme Court affirmed that judgment.[12] Afterwards, the parties reached settlements modeled on the bellwether result.

---

[9] AB at 5, 35; Sharing Agr. at 2.

[10] Sharing Agr. at 1.

[11] OB at 7; AB at 15.

[12] *Bell v. AT&T Mobility Wireless Operations Hldgs. LLC*, 299 A.3d 1 (Del. 2023).

During settlement negotiations, the relationship between Ajamie and Pullara became strained, and a dispute arose over how they would share the Contingency Fee. Pullara had the principal relationship with the Clients, and they aligned themselves with Pullara.

Acting through Pullara, seventy-nine of the eighty-three Clients terminated Ajamie's representation in August 2023.[13] By October, three additional Clients had followed suit. In January 2024, one Client asserted that the Sharing Agreement was void under the Texas Rules.[14]

To protect its claim for compensation, Ajamie filed this action and sought a charging lien against the settlement proceeds. Over the Clients' opposition, the court granted "a lien against all amounts paid in settlement in these actions up to the amount of a reasonable attorneys' fee and costs incurred."[15] In compliance with that order, the parties placed in escrow amounts sufficient to satisfy Ajamie's claim.[16]

---

[13] Pullara Aff., Ex. 16.

[14] Pullara Aff., Ex. 13.

[15] Order Addressing Petition of Ajamie LLP to Establish a Charging Lien and Motion to Strike Affidavit (Trans. ID 72475836).

[16] The record contains a large number of exhibits, affidavits, declarations, and other documents that contain various calculations relating to how many hours each attorney worked, how much each attorney billed, what their lodestars would have been, when payments have been made and how much, and what the value of the services. Many of the documents are inconsistent or contain gaps. The court has spent considerable time deciphering the documents and striving to reach values that are as objectively correct as possible.

## II.    LEGAL ANALYSIS

Ajamie has moved to enforce the Charging Lien and recover a fee. Ajamie seeks compensation under two theories. Primarily, Ajamie seeks to enforce the Sharing Agreement with the goal of recovering its share of the Contingency Fee. Alternatively, Ajamie seeks an award under principles of *quantum meruit*.[17]

The Clients agree that if the Sharing Agreement is enforceable, then Ajamie has standing to enforce its terms against them.[18] That is a significant concession, because only Ajamie and Pullara are parties to the Sharing Agreement, and Ajamie is not a party to the Client Agreements. But because of the Clients' concession, this decision does not analyze who possesses rights or owes duties under those contracts.

### A.    Should The Sharing Agreement Be Enforced?

To defeat Ajamie's attempt to enforce the Sharing Agreement, the Clients argue that the agreement is unenforceable under the Texas Rules. Ajamie counters that the Delaware Lawyers' Rules of Professional Conduct govern (the "Delaware Rules") and that the Sharing Agreement is enforceable under those rules.

Both the Texas Rules and the Delaware Rules establish minimum requirements for fee-sharing agreements. Under Texas Rule 1.04(f), a division of fees among lawyers who are not in the same firm may be made only if:

(1) the division is:

---

[17] Both Ajamie and the Clients acknowledge that this case does not involve a dispute between Pullara and Ajamie, but rather a dispute between Ajamie and the Clients. OB at 20; Response to Motion to Establish Charging Lien ¶ 9 (Trans. ID 72171427).

[18] Hearing, October 10, 2024.

(i) in proportion to the professional services performed by each lawyer; or

(ii) made between lawyers who assume joint responsibility for the representation; and

(2) the client consents in writing to the terms of the arrangement prior to the time of the association or referral proposed, including

(i) the identity of all lawyers or law firms who will participate in the fee-sharing arrangement; and

(ii) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation; and

(iii) the share of the fee that each lawyer or law firm will receive or, if the division is based on the proportion of services performed, the basis on which the division will be made; and

(3) the aggregate fee [is not illegal or unconscionable.][19]

The Texas Rule thus requires that clients consent in writing to the fee-sharing agreement *before* the arrangement is created.

The Delaware Rule is different. Under Rule 1.5(e), an agreement to share fees among lawyers who are not in the same firm may be entered only if:

(1) the client is advised in writing of and does not object to the participation of all the lawyers involved; and

(2) the total fee is reasonable.[20]

The Delaware Rule thus does not require the same level of formal, upfront client consent that the Texas Rule demands.

---

[19] Tex. Disciplinary R. Prof'l Conduct 1.04(f).

[20] Del. Lawyers' R. Prof'l Conduct 1.5(e).

7

### 1.  Choice Of Law

The enforceability of the Sharing Agreement turns initially on the governing law. The question of which law to apply presents an issue of Delaware law.[21]

No Delaware court has addressed this issue explicitly. Nor does any provision in the Delaware Rules identify choice of law principles for fee-sharing agreements. The Delaware Rules do, however, provide the following choice of law rules for disciplinary proceedings:

> (1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and
>
> (2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct.
>
> A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.[22]

The choice of law rules for disciplinary proceedings under the ethical rules logically apply when a party argues that an agreement governing an aspect of a representation violates those same ethical rules. In both scenarios, the question is whether the

---

[21] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941) ("Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law."); *In re Winstar Commc'ns, Inc.*, 2010 WL 3169355, at *44 (Bankr. D. Del. Aug. 11, 2010) ("This Court must apply the Delaware choice of law rules to determine whether the Delaware or New York statute of limitations applies to this adversary."), *aff'd*, 2013 WL 6053838 (D. Del. Nov. 15, 2013), *aff'd*, 591 Fed. Appx. 58 (3d Cir. 2015).

[22] Del. Lawyers' R. Prof'l Conduct 8.5(b).

attorneys complied with the pertinent rule. The principles for determining the applicable law should be the same.

Delaware Rule 8.5(b)(2) calls for applying Texas law because Texas is where the lawyer's conduct occurred: Pullara and Ajamie entered into the Sharing Agreement in Texas. That is the relevant conduct, making Texas law the relevant law.

Delaware Rule 8.5(b)(2) provides the strongest argument against applying Texas law, because it states that Delaware law should govern "conduct in connection with a matter pending before a tribunal.[23] Pullara and Ajamie entered into the Sharing Agreement in connection with litigation that ultimately went forward in this court, suggesting that Delaware law could apply. But Delaware Rule 8.5(b) envisions a different rule for conduct that takes place before the matter is pending before a tribunal. Comment 4 refers to "conduct in anticipation of a proceeding not yet pending before a tribunal" and specifies that in that scenario, subpart (b)(2) controls.[24] Under that provision, a lawyer shall be subject to "the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct."[25]

Here, the Delaware litigation was not yet pending when Pullara and Ajamie entered into the Sharing Agreement. At the time, Pullara and Ajamie were

---

[23] *Id.*

[24] *Id.* 8.5(b) cmt. 4.

[25] *Id.* 8.5(b)(2).

9

evaluating various jurisdictions and planned to file in Texas. The litigation only ended up in Delaware after AT&T filed preemptive declaratory judgment actions in this court. Pullara and Ajamie thus did not enter into the Sharing Agreement "in connection with a matter *pending* before a tribunal."[26]

Nor is there any basis to conclude that the predominant effect of the Sharing Agreement would be felt in Delaware. True, the lawyers would only receive a Contingency Fee if they prevailed in Delaware, but for purposes of the Sharing Agreement, the Delaware litigation's sole role was to generate the consideration that the lawyers would split according to its terms. The Client Agreements provided that any Contingency Fee would be payable in Texas, and the Sharing Agreement contained an arbitration clause contemplating dispute resolution in Texas. The performance of the Sharing Agreement thus would take place in Texas, not Delaware.

Ajamie points out that when they appeared in the Delaware litigation, Pullara and every Ajamie attorney certified that they would be bound by the Delaware Rules.[27] Ajamie also correctly observes that a Delaware court has a substantial interest in upholding its ethical rules in cases that are litigated in this state.

The Delaware Rules exist "for the protection of the citizens of this jurisdiction."[28] If a contract like the Sharing Agreement violated a Delaware rule, and

---

[26] *Id*. 8.5(b)(1).

[27] Trans. ID 49553788; Trans. ID 49557509.

[28] *See* Del. Lawyers' R. Prof'l Conduct 8.5 cmt. 1 ("Extension of the disciplinary authority of this jurisdiction to other lawyers who provide or offer to provide legal services in this jurisdiction is for the protection of the citizens of this jurisdiction.").

10

particularly if the Delaware rule were more protective of the client than another jurisdiction's rule, then the court might well apply the Delaware rule to protect the integrity of the Delaware proceeding. Here, the terms of the Sharing Agreement do not conflict with any Delaware rule, and the Texas rule is more protective.

The overarching policy goal of protecting the client also answers Ajamie's objection that Pullara should not now be able to have the Sharing Agreement declared unenforceable when he drafted and agreed to it. In a court of equity, that argument has considerable force, because Pullara does seem to be taking advantage of a flaw in his own handiwork. But that is a collateral benefit to Pullara from a client-focused ethical rule. Protecting the client from counsel takes precedence over protecting Ajamie from Pullara. In addition, Pullara was not the only lawyer involved in preparing and signing the Sharing Agreement. The Ajamie lawyers are also Texas practitioners. They could have protected themselves by spotting the problem in the Sharing Agreement and fixing it.

Looking more generally to the choice of law principles that govern contracts also points to applying Texas law. When parties have not specified a governing law,[29] and when there is an actual conflict between the law of two jurisdictions,[30] then a

---

[29] *Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 289 A.3d 1274, 1283 (Del. 2023).

[30] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015); *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)) (explaining that if the result would be the same under either body of law, "there is a 'false conflict,' and the Court should avoid the choice-of-law analysis altogether").

11

Delaware court will "assess which state has the most significant relationship to the contract and the parties to the contract using the considerations in the *Restatement (Second) of Conflict of Laws*."[31] The Restatement identifies five factors to consider according to their relative importance with respect to the particular issue:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.[32]

For the Sharing Agreement, the factors point overwhelmingly toward Texas. The place of contracting was in Texas. The negotiations took place in Texas. The place of performance—the payment of the Contingency Fee under the Client Agreements and its division under the Sharing Agreement—would take place in Texas. The location of the subject matter—the recovery to be divvied up—would be in Texas. And the contracting parties were Texas lawyers.

The Restatement calls for weighing the factors identified in § 188(2) in light of the following broader considerations set out in § 6.[33]

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,

---

[31] *Stillwater*, 289 A.3d at 1283 (quoting *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)) (internal quotation marks omitted).

[32] Restatement (Second) of Conflict of Laws § 188(2) (1971).

[33] *Stillwater*, 289 A.3d at 1284 (citing *Chemtura*, 160 A.3d at 468).

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.[34]

Those factors invite a comparatively wide-ranging and open-ended inquiry. In the current case, the most important factor is the protection of justified expectations. The Clients signed the Client Agreements envisioning that the Texas Rules would apply, and both Pullara and Ajamie seem to have envisioned that Texas law would govern their obligations. It was not until AT&T filed its declaratory judgment actions in this court that the litigation shifted from the Lone Star State to the First State. The overarching factors therefore favor Texas.

Selecting Texas law comports with *Potter v. Peirce*.[35] There, the Delaware Supreme Court held that a Delaware lawyer could not invoke a Delaware rules to block an out-of-state lawyer's claim under a fee-sharing agreement, because the Delaware rule did not apply in the lawyer's home jurisdiction and that jurisdiction did not have a similar rule.[36] The other jurisdiction's law governed the dispute. The same reasoning applies here and calls for applying Texas law.

To support the application of Delaware law, Ajamie cites the Delaware Supreme Court's decision in *Stillwater*. where a Delaware corporation purchased insurance policies, then sought coverage for an appraisal action litigated in Delaware

---

[34] Restatement, *supra*, § 6(2).

[35] 688 A.2d 894 (Del. 1997).

[36] *Id*. at 897.

state court.[37] Yet the company argued that Montana law should apply because the contract would be performed in Montana. The Delaware Supreme Court rejected that argument, holding the insurance policies could "be performed 'anywhere in the world,' including Delaware."[38] Here, the place of performance is Texas.[39] *Stillwater* therefore does not aid Ajamie.

Ajamie also relies on *Dickens v. Jason C. Webster, P.C.*,[40] a Texas case, for the proposition that when parties contract to share a fee generated by successful litigation in a particular state, they justifiably expect the law of that state to govern the contract.[41] That makes sense as a default rule when the record does not point to a different expectation. In this case, Pullara and Ajamie did not expect to litigate in Delaware when they entered into the Sharing Agreement. At that point, they were considering multiple jurisdictions but expected to litigate in Texas.[42] The *Dickens* case does not help Ajamie either.

Texas law therefore governs the Sharing Agreement.

---

[37] 289 A.3d 1274, 1286.

[38] *Id.* at 1286–1287.

[39] Client Agr. § 42.

[40] 2018 WL 6839568 (Tex. App. Dec. 31, 2018).

[41] *Id.* at *11.

[42] *See* Pullara Aff., Ex. 11 ("Up to this point it has been our intention to file suit on behalf of all plaintiffs in Galveston state court."); Pullara Aff. ¶ 9 ("[I]t was our intention to file the contemplated suits in Galveston County, Texas—an intention that I explicitly discussed with both Jason Braun and Tom Ajamie. . . . I had not considered instituting litigation on behalf of the clients in Delaware and had not discussed with any Ajamie LLP attorney the possibility of litigating in Delaware.");

14

## 2. The Sharing Agreement Does Not Comply With Texas Law.

The next issue is whether the Sharing Agreement meets the requirements of Texas law. It does not.

The Texas Rules require that a client consent in writing to "to the terms of the [sharing] arrangement prior to the time of the association or referral proposed."[43] The client must consent expressly to

(i) the identity of all lawyers or law firms who will participate in the fee-sharing arrangement; and

(ii) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation; and

(iii) the share of the fee that each lawyer or law firm will receive or, if the division is based on the proportion of services performed, the basis on which the division will be made.[44]

None of the Clients signed the Sharing Agreement, and there is no evidence in the record that any of them saw it before signing the Client Agreements.

Ajamie responds that the Clients expressly consented to the Sharing Agreement by signing the Client Agreements. But the Client Agreements only stated that each Client "expressly consents and approves of" Pullara's ability to associate with joint venture counsel, that Ajamie was likely to be the joint venture counsel, and

---

Ajamie Dec. II, Ex. 1 at 2 (January 2011 time records showing that Ajamie was researching the possibility of bringing the claims in Delaware). *See also* AB at 7, 31–32; RB at 6–7.

[43] Tex. Disciplinary R. Prof'l Conduct 1.04(f)(2).

[44] *Id.*

15

that the Contingency Fee would be split between counsel.[45] The Clients did not approve the terms of the Sharing Agreement or how the Contingency Fee would be allocated.

The Sharing Agreement therefore did not satisfy the requirements of Texas Rule 1.04(f).

### 3. The Sharing Agreement Is Unenforceable Under Texas Law.

Although the Sharing Agreement fails to pass muster under Texas Rule 1.04(f), the consequences of that violation are not immediately clear. The Texas Rules caution that they "do not undertake to define standards of civil liability of lawyers for professional conduct."[46] They further caution that a "[v]iolation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached."[47] The Texas Supreme Court has likewise cautioned that "attorneys are entitled to protection from clients who would abuse the contingent fee arrangement and avoid duties owed under contract."[48] At the same time, however, Texas courts recognize that "courts may examine the Rules to discern the policies and protections embodied in them as an aid in deciding questions of attorney civil

---

[45] Client Agr. § 41.

[46] Tex. Disciplinary R. Prof'l Conduct, pmbl. ¶ 15.

[47] *Id.*

[48] *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 563 (Tex. 2006).

liability."[49] Most importantly, Texas courts have held that a fee-sharing agreement that does not conform to Rule 1.04(f) "violates public policy and is unenforceable."[50]

Under this authority, the Sharing Agreement is unenforceable. Ajamie nevertheless offers two arguments in favor of enforcement.

### a.    The *Chachere* Defense

Ajamie first argues that Pullara is to blame for any failure to obtain client consent. Ajamie relies on a Texas Court of Appeals decision in *Chachere v. Drake*,[51] where one lawyer failed to disclose a fee-sharing agreement to the client. The Texas appellate court held that the other lawyer could enforce it against the lawyer who was responsible for the non-disclosure.

Two distinctions render *Chachere* unpersuasive. First, the decision was issued in 1996, before the 2005 amendment that requires the client's specific consent to a fee-sharing agreement.[52] The *Chachere* decision thus applied a rule which only required that "the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made."[53] The record showed that the client

---

[49] *Gillespie v. Hernden*, 516 S.W.3d 541, 547 (Tex. App. 2016).

[50] *Dickens*, 2018 WL 6839568, at \*12 (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 205 (Tex. 2002)); *Lemond v. Jamail*, 763 S.W.2d 910, 914 (Tex. App. 1988).

[51] 941 S.W.2d 193 (Tex. App. 1996),

[52] Order Promulgating Amendments to Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, 68 Tex. B.J. 202 (2005).

[53] *Chachere*, 941 S.W.2d at 195 n. 3.

had discussed the case with both lawyers, and "there was no showing that the client's confidences would be violated" by enforcing the agreement.[54] That was enough under the 1996 rule. The 2005 amendment imposed stricter requirements.

Second, the *Chachere* court found that the lawyer failed to disclose the fee-sharing agreement to the client as a result of that lawyer's "own fraudulent actions."[55] The record in this case contains no evidence that Pullara engaged in fraud. Ajamie and Pullara were both Texas lawyers and equally responsible for ensuring compliance with the Texas Rules. Consequently, *Chachere* does not provide a basis for enforcing the Sharing Agreement.

### b. The *Enochs* Defense

Ajamie next argues that the Texas doctrine of quasi-estoppel prevents the Clients from objecting to the Sharing Agreement. That argument likewise fails.

"Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. […] The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[56] "Thus, quasi estoppel forbids a party from accepting the benefits of a transaction or statute and

---

[54] *Id.* at 196.

[55] *Id.*

[56] *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citations omitted).

then subsequently taking an inconsistent position to avoid corresponding obligations or effects."[57]

Ajamie relies on *Enochs v. Brown*,[58] another Texas appellate court decision. There, the mother of the victim of a car accident signed a contingent fee agreement with a law firm to sue the driver of the car. The court subsequently appointed a guardian for the injured person. After the parties settled, the guardian challenged the validity of the contingent fee agreement under a Texas statute stating that "[a] contingent fee contract for legal services must be in writing and signed by the attorney and client."[59] The mother indisputably signed the contingent fee contract, but the guardian had not. The law firm argued that the guardian could not challenge the contingent fee agreement after the firm had performed and the client had accepted the benefits of its services. The Texas court agreed, reasoning that for the guardian to challenge the validity of the contract after receiving the benefit of counsel's services would allow the guardian to assert "a right inconsistent with a position he [had] previously taken."[60]

This case does not involve an effort to enforce a contingent fee agreement. It involves an effort to enforce a fee-sharing agreement, and "[i]n *Enochs*, there was no

---

[57] *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App. 1994) (citing *Mexico's Indus., Inc. v. Banco Mexico Somex, S.N.C.*, 858 S.W.2d 577, 581 n. 7 (Tex. App. 1993); *Turcotte v. Trevino*, 499 S.W.2d 705, 712–713 (Tex. Civ. App. 1973)).

[58] 872 S.W.2d 312 (Tex. App. 1994).

[59] Tex. Gov't Code § 82.065(a).

[60] *Enochs*, 872 S.W.2d at 317.

issue of fee sharing."[61] More importantly, there is no evidence that any Client learned about the terms of the Sharing Agreement or had the opportunity to challenge it. There is nothing unconscionable about the Clients challenging it now.

Ajamie does better by citing *Gillespie*, another decision from a Texas appellate court.[62] That decision held that a fee-sharing agreement was enforceable regardless of the lawyers' failure to comply with Rule 1.04(f). As in this case, it was "undisputed that the clients did not consent in writing to a fee-sharing agreement concerning Zlotucha before Zlotucha began representing the clients."[63] But unlike in this case,

> [T]he undisputed evidence, including the clients' own depositions, proves the clients knew that Zlotucha would represent them, that Hernden would share his fee with Zlotucha, and the clients agreed to the fee sharing. At a minimum, the summary judgment evidence establishes that both attorneys maintained responsibility for the representation, the clients knew the identity of all the lawyers who participated in the fee-sharing agreement, and the clients knew, not later than when they signed the settlement disbursement agreement, what share of the fee each lawyer received.[64]

The court therefore enforced the agreement.

Ajamie correctly argues that *Gillespie* permits a court to overlook minor foot faults when deciding whether to enforce a fee-sharing agreement, particularly where

---

[61] *Cokinos, Bosien & Young v. Moore*, 2020 WL 549066, at *4 (Tex. App. Feb. 4, 2020).

[62] 516 S.W.3d 541.

[63] *Id.* at 552.

[64] *Id.*

the evidence shows that the clients gave actual consent.[65] The record in this case does not support that outcome. Neither the Client Agreements nor the settlement agreement referenced the fee division,[66] and those were the only two documents that the Clients signed. Ajamie correctly asserts that the Clients reasonably understood that Ajamie and Pullara intended to share the Contingency Fee, but that is only one of Rule 1.04(f)'s requirements. There is no evidence that either Ajamie or Pullara obtained consent to the specific allocation, as the Texas Rule requires.

Finally, since *Gillespie*, another Texas decision observed that by amending the Texas Rule, the Texas Supreme Court "determined that clients are best protected by fee-sharing agreements between attorneys that comply with the requirements of Rule 1.04(f) and (g)."[67] That determination suggests that a court applying the Texas Rules should approach situations like *Gillespie* with caution.

### c. The Conclusion Regarding Enforceability

The Sharing Agreement violates Texas Rule 1.04(f) and cannot be enforced against the Clients. Ajamie therefore cannot rely on the Sharing Agreement to recover its share of the Contingency Fee.

---

[65] *Id.* at 544.

[66] Client Agr. §§ 3, 41; Settlement Agr. § 8.1 ("Each Party is responsible for his, her, or its own attorneys' fees, expenses, and costs.").

[67] *Dickens*, 2018 WL 6839568, at *13.

21

**B. The *Quantum Meruit* Award**

Ajamie's inability to enforce the Sharing Agreement does not end the analysis. That is because "in the absence of a valid contract, principles of *quantum meruit* come into play and can support a recovery under a theory of unjust enrichment."[68] The phrase *quantum meruit* is Latin for "as much as he deserves."[69] A *quantum meruit* recovery is "a quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[70] "*Quantum meruit* damages are based on an objective [and] reasonable valuation of the services provided by reference to the fair market value of those services."[71] "A reasonable valuation is 'the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered.'"[72]

---

[68] *Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 450 (Del. Ch. 2020).

[69] *Marta v. Nepa*, 385 A.2d 727, 730 (Del. 1978) (citation omitted).

[70] *Petrosky v. Peterson*, 859 A.2d 77, 79 (Del. 2004).

[71] *LCT Cap., LLC v. NGL Energy P'rs LP*, 2022 WL 17851423, at *4 (Del. Super. Ct. Dec. 22, 2022), *modified*, 2023 WL 1115628 (Del. Super. Ct. Jan. 30, 2023); *see Middle States Drywall, Inc. v. DMS Properties-First, Inc.*, 1996 WL 453418, at *10–11 (Del. Super. Ct. May 28, 1996), *aff'd*, 692 A.2d 412 (Del. 1997); *Cheeseman v. Grover*, 490 A.2d 175, 177 (Del. Super. Ct. 1985); Dan B. Dobbs, *Law of Remedies: Damages, Equity, Restitution,* 388 (2d ed. 1993).

[72] *Id.* (quoting *Middle States Drywall*, 1996 WL 453418, at *10).

Ajamie argues that it is entitled to recover in *quantum meruit* for the reasonable value of work performed.[73] The Clients agree.[74] The parties only disagree over the size of the award.

This court has discretion when determining a reasonable fee award.[75] In *Mahani*, the Delaware Supreme Court held that "[t]o assess a fee's reasonableness, case law directs a judge to consider the factors set forth in the Delaware Lawyers' Rules of Professional Conduct . . . ."[76] Those factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.[77]

---

[73] OB at 29–32; RB at 24.

[74] AB at 44.

[75] *Mahani v. EDIX Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[76] *Id.* at 245–246 (footnote omitted).

[77] Del. Lawyers' R. Prof'l Conduct 1.5(a).

The *Mahani* decision also instructed trial courts to consider "whether the number of hours devoted to litigation was excessive, redundant, duplicative or otherwise unnecessary."[78]

One standard approach to determining an attorney's *quantum meruit* fee starts with the law firm's lodestar, calculated by multiplying the hours billed by a reasonable market rate. Once the court has determined that amount, the court can adjust the figure upward or downward based on the *Mahani* factors.

### 1. Ajamie's Lodestar

Ajamie has submitted affidavits with slightly different calculations of its lodestar. One affidavit says $8,919,102. Another says $8,907,271. Both figures are in the same ballpark, and Ajamie has explained that the different amounts result from fixing errors, addressing inconsistencies, or exercising billing judgment.[79] To be conservative and favor the Clients, the court will start with the lower lodestar of $8,907,271.

The Clients object to $716,216 of the lodestar on the basis that Ajamie agreed not to bill the Clients for the first six months of the lawsuit.[80] The end date for the first six months turned out to be July 10, 2012.[81] But although Ajamie agreed not to bill the Clients for work performed during that period, the court will still take that

---

[78] *Mahani*, 935 A.2d at 247–248 (internal quotation marks omitted).

[79] RB at 23 n. 92; Ajamie Dec. I ¶ 6.

[80] Client Agr. § 3(b).

[81] RB at 23; Ajamie Dec. I ¶ 6 n. 2; Ajamie Dec. II ¶ 61; *Id.*, Ex. 1 at 255.

24

work into account when conducting a *quantum meruit* analysis. Under the hybrid representation that Ajamie contemplated, the free initial six months and the 50% reduction in hourly rates were concessions Ajamie made in exchange for its share of the Contingency Fee. Once the court has shifted to a *quantum meruit* analysis, all factors must be taken into account, including the full value of Ajamie's lodestar.

The Clients also dispute the time value of hours that Ajamie incurred between July 7, 2022, and November 30, 2023. Ajamie values those hours at $140,060.10. The Clients cite a detailed billing statement showing that $46,915 of the work related to services (i) rendered after August 22, 2023, when all but four of the Clients terminated Ajamie, or (ii) provided by professionals who were not authorized to bill the Clients.[82] Ajamie does not dispute these points. Accordingly, the court will treat the value of Ajamie's lodestar for this period as $93,145.10.

The Clients have raised a series of more specific objections to particular time entries, but it makes little sense for the court to nitpick Ajamie's billing records. "For a Court to second-guess, on a hindsight basis, an attorney's judgment as to whether work was necessary or appropriate is hazardous and should whenever possible be avoided."[83] The Clients had the opportunity to review Ajamie's billing records regularly as part of the hourly fee component of the representation. They could have raised contemporaneous objections if they thought Ajamie was overbilling. Also, the

---

[82] Pullara Aff. ¶ 21(c)(ii); AB at 17–18.

[83] *Malkani v. Cunningham*, 2024 WL 3860112, at *2 (Del. Ch. Aug. 19, 2024) (quoting *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 997 (Del. Ch. 2012)) (internal quotation marks omitted).

25

Clients made some mathematical errors when calculating Ajamie's lodestar.[84] The court will not make any other hours-based adjustments. That leaves a total lodestar of $8,860,356.

Another dispute concerns the rates to use when calculating Ajamie's lodestar. To reiterate, Ajamie never applied any increases to its hourly rates over the twelve years of litigation, instead keeping its rates fixed at the 2011 level. Ajamie argues that for purposes of a *quantum meruit* analysis, the court should use its market rates as adjusted from year to year.[85] The Clients respond that Ajamie should be held to its 2011 rates.

A *quantum meruit* analysis seeks to determine an appropriate fee based on the value of the services provided. That means using market rates to determine the lodestar. The court therefore will use Ajamie's market rates for each year. That amount equates to $13,178,616.78.[86]

### 2. Adjusting The Award

After computing the lodestar, the court can adjust the amount upward or downward based on the *Mahani* factors. This decision considers each factor in turn.

---

[84] RB at 22–23.

[85] OB at 7.

[86] Ajamie Dec. I, Ex. 3. The total fee using annually adjusted market rates as presented in the exhibit has been adjusted to account for the necessary corrections to the lodestar explained above.

### a. Time, Labor, And Skill

The first *Mahani* factor is "[t]he time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." This factor allows a court to assess whether the lawyers' lodestar reflects too much (or too little) time for the work.

Ajamie's representation of the Clients required considerable time and labor. The litigation took twelve years, and the Ajamie lawyers devoted a total of 31,908.3 hours to the case.[87]

The litigation also required considerable skill, because AT&T was well-funded, well-represented, and recalcitrant. Discovery alone took the better part of eight years, and during that process, "AT&T aggressively resisted discovery, even after the court ruled against AT&T on specific issues. As the court noted on several occasions, AT&T was the most obstructive litigant that this judge has ever seen, whether in private practice or on the bench."[88]

The trial was another complex undertaking. It took five days, and the parties introduced 3,187 exhibits, including thirty-nine deposition transcripts. Four fact witnesses—all present or former AT&T executives—and three experts testified live.[89]

---

[87] Corrected APR Plaintiffs' Motion for Attorneys' Fees and Expenses Incurred in Connection with Their Successful Claim for Material Breach of the Partnership Agreements [Corrected Only as to Captions] (Trans. ID 67794728); OB at 8 n. 28.

[88] *In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *17 (Del. Ch. Mar. 9, 2022).

[89] *Id*. at *2.

This factor fully supports Ajamie's lodestar.

### b. Preclusion Of Other Employment

The second *Mahani* factor is "[t]he likelihood, if apparent to the client, that the substance of the particular employment will preclude other employment by the lawyer."

A lawyer's time is a limited commodity. Ajamie is a boutique litigation firm that currently consists of eleven lawyers. By devoting 31,908.3 hours to this litigation. Ajamie could not devote those same hours to other paying clients.

Whether the Clients could perceive that reality is different question. This factor therefore supports awarding Ajamie its lodestar, but the court gives it diminished weight.

### c. Customary Local Fees

A third *Mahani* factor in the *quantum meruit* analysis is "[t]he fees customarily charged in the locality for similar legal services." In other words, a *quantum meruit* award should provide market rate compensation.

When billing the Clients, Ajamie charged half of its 2011 standard hourly rates. Those rates were $350, $550, and $750 per hour depending on the attorney's seniority, and $140 per hour for paralegals.[90] Those rates are reasonable, even comparatively low, for litigators practicing in the Court of Chancery.

Under the Client Agreements, Ajamie could have increased its rates each year and charged the Clients those new, market rates. As discussed previously, the court

---

[90] Client Agr., Attachment 1.

has used Ajamie's market rates when calculating its lodestar. Like Ajamie's 2011 rates, the adjusted rates are reasonable, even comparatively low, for litigators practicing in the Court of Chancery.

### d. The Amount Involved And The Results Obtained

The fourth *Mahani* factor is the "amount involved and the results obtained." Ajamie and Pullara successfully recovered $9,311,695 plus interest in the bellwether case.[91] The parties later reached a series of settlements in the remaining ten cases. The total consideration obtained from AT&T was $134,371,982.85.[92]

That is a significant result that warrants a significant fee. The Clients have agreed to pay Pullara $15,818,361.59 as his share of the Contingency Fee.[93] Pullara has received $1,330,225.36 as payment for his hourly fees, with an additional $651,391.61 still unpaid for a total of $1,981,616.97.[94] Adding Ajamie's computed lodestar of $13,178,616.78 results in a total fee of $30,978,595.34, or approximately 23% of the Clients' total recovery in a case that went all the way through trial and an

---

[91] *Bell v. AT&T*, 299 A.3d 1.

[92] Settlement Agr. §§ 1.28, 1.32, 1.36. The parties sought to keep the settlement amount confidential. There is no basis for doing so. The public has a right to know the outcome of a case that took up over a decade of the court's time and resources.

[93] AB at 53–54.

[94] AB at 52–53 (Pullara's paid invoices total $678,833.75); Pullara Aff. ¶ 32(a) (same); *id.* ¶ 22 (Pullara was paid half of his claimed amount for unpaid hourly fees through a distribution from escrow); *id.* ¶ 34 n. 84 (the remaining and still escrowed half of Pullara's unpaid hourly fees amount to $651,391.61).

appeal. That is relatively low when compared to the amounts attorneys regularly charge in large contingent cases, which often reaches 30% or more of the recovery.[95]

The 23% figure is higher than the 20% Contingency Fee in the Client Agreements, but that does not warrant a reduction of the *quantum meruit* fee. The 20% Contingency Fee was part of a larger bargain that also included paying hourly rates at a 50% discount, so the 20% figure undercounts the consideration that the Client Agreements contemplated. Later in the case, several clients agreed to a 30% Contingency Fee in exchange for forgoing hourly billing, suggesting that a 30% cut of the total recovery was fair.

This factor supports awarding Ajamie its full lodestar at least. It also provides support for an upward adjustment.

### e. Time Limitations

The fifth *Mahani* factor is "time limitations imposed by the client or by the circumstances." This factor allows a Court to award a larger fee for expedited work. The factor does not apply.

---

[95] *See In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 716–717 (Del. Ch. 2023), *aff'd*, --- A.3d ----, 2024 WL 3811075 (Del. Aug. 14, 2024); American Bar Association, *Fees and Expenses*, December 3, 2020 (https://www.americanbar.org/groups/legal_services/milvets/aba_home_front/information_center/working_with_lawyer/fees_and_expenses/); *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 833 (December 2010) ("The average award [in 2006 and 2007 class action settlements] was 25.4 percent and the median was 25 percent. Most fee awards were between 25 percent and 35 percent, with almost no awards more than 35 percent."); *id*. at 830 ("In any event, the percentages in both 2006 and 2007 are far lower than the portions of settlements that contingency-fee lawyers receive in individual litigation, which are usually at least 33 percent.").

#### f. The Nature And Length Of Ajamie's Professional Relationship With The Clients

The sixth *Mahani* factor is "[t]he nature and length of the professional relationship with the client." This factor could support a higher or lower fee depending on the facts. Sometimes, a law firm may offer a discount to a longstanding client. At other times, a longstanding client may pay a premium, recognizing that the law firm has acquired knowledge about the client that enables the law firm to work more efficiently.

In this case, Ajamie had a long relationship with the Clients for the simple reason that the case lasted a long time. But Ajamie did not develop a meaningful relationship with the Clients of the type that this factor contemplates. In fact, Pullara maintained the principal relationship with the Clients.

This factor does not contribute meaningfully to the *quantum meruit* analysis.

#### g. Ajamie's Experience, Reputation, And Ability

The seventh *Mahani* factor is "[t]he experience, reputation, and ability of the lawyer or lawyers to perform the services." This factor largely duplicates the inquiry into market rates, because a market rate should take into account experience, reputation, and ability. The seventh *Mahani* factor nevertheless provides an express opportunity for the court to increase or decrease the fee award to account for those factors.

The Clients argue that any *quantum meruit* award should be reduced because the lead Ajamie lawyer undervalued the potential recovery compared to what Pullara and Ajamie ultimately achieved. That seems to be an argument that under this factor,

31

Ajamie did not actually possess the ability and expertise necessary to evaluate the case. But that is not a reason to reduce the *quantum meruit* fee in this case. Different attorneys may value a case differently, and that was true here.[96] The lead lawyer's valuation was not so out of whack as to undercut the market value of Ajamie's services.

In this case, Ajamie's attorneys had the necessary experience and skill to pursue the claims. This factor does not warrant an upward or downward adjustment in the *quantum meruit* award.

### h.      Whether The Fee Is Fixed Or Contingent

The eighth *Mahani* factor is whether the fee is fixed or contingent. A lawyer who works on a contingency accepts significant risk, warranting a higher fee. A lawyer who is paid by the hour does not take on that additional risk and should not receive a premium to the lawyer's standard rates.

In this case, the Client Agreements called for a hybrid fee. There was an hourly component where Pullara and Ajamie billed at 50% of their rates. There was also the Contingency Fee, initially set at 20% of any recovery. As noted, some of the Clients subsequently signed amendments that eliminated any obligation to pay further hourly fees in return for raising the Contingency Fee percentage to 30%.

A hybrid structure of this sort is a well-established alternative that sits between hourly billing at full rates and a fully contingent representation. Under this

---

[96] RB at 28.

structure, Ajamie bore the risk that it would not receive the Contingency Fee. That additional risk warrants an upward adjustment in the amount of the fee.

### i. Conclusion On Award Adjustment

Weighing the eight factors leads to the conclusion that Ajamie's *quantum meruit* award should be increased compared to the earlier computed lodestar. In this case, the Sharing Agreement—even though unenforceable under the Texas Rules—provides a logical starting point for applying a contingency factor to the *quantum meruit* fee award. The Client Agreements calculated the Contingency Fee as 20% of any recovery if the attorneys also billed the Client on an hourly basis, and 30% for Clients who opted out of hourly billing altogether. Fourteen out of the eighty-three Clients went for the full contingent option.

To support an upward adjustment, Ajamie points to *Webb v. Harleysville Insurance Company*.[97] There, a victim of an automobile accident and his wife signed contingent fee agreements providing a law firm with 35% of any recovery as a fee.[98] The victim recovered damages after trial. The amount the victim received, however, was the same as what the defendants had offered in settlement before trial. The clients terminated their lawyers after turning down the settlement and before the trial.[99] The terminated lawyers sought a *quantum meruit* award, and the court

---

[97] 1995 WL 716757 (Del. Super. Ct. Oct. 23, 1995).

[98] *Id*. at *1.

[99] *Id*. at *1–2.

granted an award "based on an hourly rate plus an additional one-third due to the contingent nature of the claim, the issues involved, and the result achieved."[100]

The *Harleysville* court thus increased the *quantum meruit* fee by an amount roughly equal to the contingency fee percentage. But there, the original agreed-upon fee had been fully contingent. Here, the Client Agreements called for Pullara and Ajamie to receive attorneys' fees based on hourly billing at 50% rates plus the Contingency Fee. That the total fee was only partly contingent calls for a more modest increase than one-third. Here, the parties bargained for 20%.[101] That number falls within the range of reasonableness in this context, so the court will use it.

Ajamie's *quantum meruit* award is increased by 20%—or one-fifth—for a total of $15,814,340.14.

### 3. Amounts To Deduct From The Final Award

Under the Client Agreements, Ajamie has received payments from the Clients based on 50% of its hourly rates. A *quantum meruit* award must take into account those amounts. The parties disagree about how much of Ajamie's fees has already been paid. Ajamie says it has received $2,797,568.05 in total.[102] The Clients contend

---

[100] *Id*. at *3.

[101] Some Clients agreed to a 30% Contingency Fee in exchange for not paying any additional hourly fees, but the court lacks the information necessary to account for that complication. Fourteen out of the eighty-three Clients went for the full contingent option, so the court could use a weighted average, but the clients' recoveries (and hence the size of the fee) depend their ownership stakes, not a headcount. No one provided ownership data.

[102] OB at 31.

that Ajamie has already been paid $2,863,812.27.[103] Ajamie submitted detailed Excel spreadsheets specifying how much the firm received.[104] The Clients rely on amounts identified in invoices for the period up through November 30, 2016.[105] Ajamie's evidence is more comprehensive and persuasive. The court will use Ajamie's figure of $2,797,568.05.

The Clients argue that Ajamie has also been incorrectly reimbursed for expenses post-dating Ajamie's termination that total $2,050.22. As this decision previously determined, Ajamie should not receive compensation for work performed after August 22, 2023. Nor should Ajamie receive expenses after that date. The court therefore will add $2,050.22 to Ajamie's figure, resulting in $2,799,618.27. That amount will be deducted from the ultimate fee, effectively forcing Ajamie to disgorge that amount.

### 4. The Implications Of The Texas Litigation

The Clients are currently suing Ajamie in Texas for alleged breaches of fiduciary duty. They ask that the court either rule that Ajamie has forfeited its award or, at a minimum, hold the award in escrow pending the outcome of the Texas matter. The court will do neither.

---

[103] AB at 15, 46.

[104] Ajamie Dec. I, Ex. 6 (Excel sheet showing $1,290,392.20 in fee payments from first retainers); *Id.*, Ex. 7 (Excel sheet showing $681,492.86 in fee payments from second retainers and $825,683 in payment from escrow account).

[105] AB at 15, 46; Pullara Aff. ¶ 29(c); *id.* ¶ 31 n. 64.

The Clients first ask the court to deny Ajamie any award. They rely on the Texas Supreme Court's decision in *Burrow v. Arce*[106] for the proposition "that a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client."[107] This court is not adjudicating the breach of fiduciary duty claim. This court is determining the amount of Ajamie's fee. It will be up to the Texas court to determine what, if anything, happens next.

Alternatively, the Clients ask the court to hold Ajamie's fee in escrow until the Texas matter is resolved. Such an order would be equivalent to prejudgment attachment. "Equitable relief that has the sole function and effect of freezing [a litigant's] assets in place to make them available to satisfy any possible future money judgment … is not within the proper exercise of the Court's power."[108] An exception exists in extreme scenarios where property would otherwise be removed from the

---

[106] 997 S.W.2d 229 (Tex. 1999)

[107] *Id*. at 240.

[108] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 482 (Del. Ch. 2022) (quoting *Uragami v. Century Int'l Credit Corp.*, 1997 WL 33175027, at *2 (Del. Ch. Dec. 2, 1997), *aff'd*, 710 A.2d 218 (Del. 1998)).

jurisdiction and placed outside the court's control.[109] "But the circumstances in which the equities might warrant that extreme result are limited."[110]

"To obtain a preliminary injunction, a plaintiff must demonstrate both a reasonable probability of success on the merits and some irreparable harm which will occur absent the injunction."[111] "Additionally, the Court shall balance the conveniences of and possible injuries to the parties."[112]

There is no pending claim against Ajamie in this action. Instead, the Clients want the award escrowed for a potential future award of damages in Texas for Ajamie's alleged breach of fiduciary duty. It is neither possible nor appropriate at this

---

[109] *See* 6 *Del. C.* § 1307(a) (authorizing injunctive relief to block fraudulent transfer); *Destra Targeted Income Unit Inv. Tr. v. Parmar*, 2017 WL 373207, at \*2–3 (Del. Ch. Jan. 25, 2017) (granting preliminary injunction to prevent "defendants and parties acting in concert with them from distributing cash and other securities that they will receive in connection with the transactions governed by" a merger agreement alleged to be a fraudulent conveyance where there was "[a] meaningful threat that a defendant may render relief meaningless by dissipating assets or removing them from the court's jurisdiction"); *Brinati v. TeleSTAR, Inc.*, 1985 WL 44688, at \*5 (Del. Ch. Sept. 3, 1985) (granting preliminary injunction protecting court's jurisdiction over assets by restraining defendants from expending those funds, other than for purposes of winding up or liquidating).

[110] *Palkon v. Maffei*, 311 A.3d 255, 285 (Del. Ch. 2024), *cert. denied*, 2024 WL 1211688 (Del. Ch. Mar. 21, 2024).

[111] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) (citing *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974)); *cf. In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1228 (Del. Ch. 2022) ("Admittedly, showing irreparable harm is one way of demonstrating that other remedies are inadequate, but it is not the only way."), *aff'd*, --- A.3d ----, 2024 WL 3616269 (Del. Aug. 1, 2024).

[112] *Revlon*, 506 A.2d at 179 (citing *Gimbel*, 316 A.2d at 602).

stage for this court to determine whether the Clients have a reasonable probability of success on the merits with respect to their breach of fiduciary duty claim.[113]

Equally important, the Clients have not so much as attempted to explain why an award of damages from the Texas court would not provide adequate relief. They say the injunction they want "would ensure that [the Clients] retain the ability to recover any award in the Texas action."[114] Likely so, but that is not the test. "If the property [for which injunctive relief is sought] is money, then there must be a concrete threat that the defendant intends to render itself insolvent and judgment-proof."[115] Nothing suggests that here.[116]

The request to escrow Ajamie's fee is denied.

---

[113] *See Am. Healthcare*, 285 A.3d at 484 ("For this court to assess whether Aizen has a probability of success on the merits would require the court to evaluate the claims in the California Action. The parties have not briefed those issues, and it would be both inefficient and suggest a lack of comity for this court to delve into the merits of a case pending before a sister court.").

[114] AB at 49.

[115] *Am. Healthcare*, 285 A.3d at 483.

[116] *See In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 420 (Del. Ch. 2010) ("No question has been raised, much less evidence presented, to cast doubt on CONSOL's solvency or ability to satisfy a damages award.").

### 5. Interest

"In Delaware, prejudgment interest is awarded as a matter of right"[117] and "computed from the date payment is due."[118] "In the absence of an express contract rate, Delaware courts use the 'legal rate' as a default rate."[119] The legal rate is "5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due."[120]

Ajamie's *quantum meruit* award replaces the hourly fees and the Contingency Fee it would receive under the Client Agreements. The parties agree that Ajamie is still contractually entitled to its hourly fees. Prejudgment interest thus accrues on unpaid fees for hourly services from the date payment was due.

Even if the Sharing Agreement could be enforced, interest would only run on the Contingency Fee from the time of recovery. Since the Sharing Agreement is unenforceable, Ajamie cannot rightfully claim any part of the Contingency Fee. The point in time when the size of Ajamie's *quantum meruit* award can be conclusively ascertained is the date of this judgment. Therefore, all amounts awarded through *quantum meruit* that exceed the value of Ajamie's lodestar, calculated at 50% of 2011 rates, will not earn prejudgment interest. Put differently, prejudgment interest only

---

[117] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citing *Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209 (Del. 1978)).

[118] *Id.*

[119] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch. 2010) (citing 6 *Del. C.* § 2301(a)), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[120] 6 *Del. C.* § 2301(a).

runs on the *quantum meruit* award to the extent it relates to unpaid fees for hourly services.

Over the course of the decade-long litigation, the Clients sent retainer payments into an Ajamie trust account. Ajamie sent invoices for hourly fees periodically. There does not seem to have been any delays in paying those invoices, so interest will not run on the fees that were paid on time.

But there are still unpaid hourly fees amounting to $696,391.37, which relate to unbilled services.[121] Payment for those services was not due while they remained unbilled. Had there not been a dispute regarding attorneys' fees, Ajamie likely would have been paid once AT&T funded the settlement. That happened on April 4, 2024.[122] Instead, because of this dispute, both Pullara and Ajamie only received half of their unpaid hourly fees.[123] Therefore, prejudgment interest will accrue on the still unpaid hourly fees starting on April 4, 2024.

---

[121] OB at 7; Ajamie Dec. II ¶ 51; AB at 15.

[122] AB at 14; Ajamie Dec. II ¶ 53.

[123] OB at 17; Ajamie Dec. I ¶ 18; Ajamie Dec. II ¶ 51; AB at 15.

The resulting award will accrue post-judgment interest at the legal rate, starting when judgment is entered.[124] That includes the prejudgment interest.[125]

### 6. Conclusion On The *Quantum Meruit* Award

Ajamie is entitled to reasonable attorneys' fees consisting of $15,814,340.14 plus pre- and post-judgment interest as specified above. Since the Clients have already paid $2,799,618.27, Ajamie has a right to an additional $13,014,721.87 plus interest. The escrow agent must release this amount to Ajamie.

---

[124] *Brandin v. Gottlieb*, 2000 WL 1005954, at *30 (Del. Ch. July 13, 2000) (granting post-judgment interest to "attempt to guarantee that Jill will, at the time of payment, receive from Stephen the real economic value of the final judgment on the date it is first entered"); *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000) ("Interest on a judgment begins to accrue when the judgment is entered as final and determinative of a party's rights.") (citing *Moffitt v. Carroll*, 640 A.2d 169, 178 (Del. 1994)); *see also NGL Energy P'rs LP v. LCT Cap., LLC*, 319 A.3d 335, 345 (Del. 2024) (noting that 6 *Del. C.* § 2301(a) "calls for post-judgment interest to accrue 'from the date of the judgment,' not from the date of the verdict or damages award"); *Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 982 (Del. 2021) ("A litigant who is subject to a judgment at law . . . is not responsible for post-judgment interest until judgment is entered.").

[125] *NGL Energy P'rs v. LCT Cap.*, 319 A.3d at 341 (noting that assessing interest on the entire amount of the judgment "accords with a trend seen in '[s]everal recent cases ... [recognizing] that, subject to a court's discretion to order otherwise, "a party is [ ] entitled to post-judgment interest until the date of payment on an amount that includes both the amount of the judgment and the amount of prejudgment interest"'"); *Beard Rsch.*, 8 A.3d at 621 ("I award Plaintiffs post-judgment interest on the full amount of the judgment, including that part comprised of prejudgment interest."); *Brandin*, 2000 WL 1005954, at *30 ("Without an award of post-judgment interest on the full award, the obvious purpose of awarding pre-judgment interest-to ensure that Jill is fully compensated for the loss of the time value of her money-would be undercut.").

41

## C.     Issues Not Addressed

There are issues that this decision has not addressed. One is the amount of Pullara's fee. The other is the Clients' obligations among themselves.

### 1.     Pullara's Fee

This opinion concerns Ajamie's right to fees. During briefing, the Clients asked this court to authorize the release of $16,469,753.20 from the escrow account to Pullara.[126] In parallel, Pullara has filed a motion for an order authorizing the distribution of escrowed funds for his share.[127]

Under the Client Agreements, the total Contingency Fee would not increase if Pullara associated with joint venture counsel.[128] The Clients claim that the total Contingency Fee amounts to $29,606,747.66.[129] Ajamie contends that that number is $29,606,288.[130] Whoever is correct, the Clients collectively are not obligated toward Pullara to pay more than that balance.

The Clients assert that if the Sharing Agreement was enforceable, Pullara would have been entitled to $15,818,361.59 as his share of the Contingency Fee.

---

[126] AB at 54.

[127] Michael Pullara's Motion for Order Authorizing Distribution of Escrow Funds (Trans. ID 74871138).

[128] Client Agr. § 41.

[129] AB at 53.

[130] OB at 7.

42

Therefore, they have agreed to pay Pullara that amount.[131] Using that figure, the most Ajamie could receive under the $26 million'ish cap is $13,788,386.07. According to the Clients, Ajamie's award must top out there.

The Clients' calculation of Pullara's fee does not bind the court. The court has ruled on the *quantum meruit* fee that Ajamie will receive. This decision does not address how much Pullara should receive, nor how to adjust Ajamie and Pullara's fees to fit within the cap. If the total of Ajamie's award and the Clients' agreed-upon contingent payment to Pullara exceeds the Clients' obligations under the Client Agreements, then they can litigate that issue in an appropriate forum.

That said, the *quantum meruit* award that this decision approves would not appear to cause Pullara and Ajamie's combined compensation to exceed the cap. As noted, the *quantum meruit* award replaces both the hourly fees and the Contingency Fee. The roughly $29 million cap only concerned the Contingency Fee. To the extent the *quantum meruit* award compensates Ajamie for the hourly fees that it earned, those amounts do not count against the cap. Deducting the value of hourly fees ($2,799,618.27 already paid and $696,391.37 left unpaid) from the total award leaves $12,318,330.50. Adding the $15,818,361.59 that the Clients agreed to pay Pullara leaves approximately $1.5 million to spare.

---

[131] AB at 53–54.

**2.      The Clients' Obligations Among Themselves**

This opinion addresses how much Ajamie is entitled to from the amounts in escrow. It does not address how much each Client must pay nor how any excess payments will be reallocated among the Clients.

## III.      CONCLUSION

Ajamie cannot recover a share of the Contingency Fee under the Sharing Agreement because that agreement violates Texas Rule 1.04(f) and is unenforceable. Under principles of *quantum meruit*, Ajamie is entitled to a fee in the amount of $13,014,721.87 plus pre- and post-judgment interest as specified above. Ajamie may enforce the Charging Lien against the escrowed proceeds and recover that amount.

Within thirty days, the parties will submit an order, agreed as to form, that implements the relief set forth in this decision and brings this case to a close. The court expects that after receiving that order, the escrow agent will release the fee award to Ajamie.

If the parties believe that additional issues remain for the court to decide, then they will submit a joint letter identifying those issues and proposing a schedule for resolving them. That is not an invitation for attempted do-overs, only a request that the parties check to see if there are any issues that the court has missed.